# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

ANTHONY D. AMAKER,

                                        Plaintiff,

        v.                                              9:19-CV-1253
                                                        (LEK/ATB)

SGT. COLEMAN, et al.,

                                        Defendants.

ANTHONY D. AMAKER, Plaintiff, pro se
AMANDA K. KURYLUK, Asst. Attorney General, for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge.

## I.    Background

### A.    Procedural History

This action was originally commenced in the Southern District of New York.  On May 12, 2017, the Honorable Colleen McMahon of the Southern District of New York denied plaintiff's application to proceed in forma pauperis pursuant to 28 U.S.C. § 1915 (g). (Dkt. No. 4).  Judge McMahon found Plaintiff had acquired more than "three strikes" before commencing the action and failed to show that he was in imminent danger of serious physical injury at the time of filing. (*Id.*)  Plaintiff paid the $400.00 filing fee, and the action was reopened on August 26, 2019. (Dkt. No. 12).  On October 3, 2019, plaintiff's claims arising out of his incarceration at Bare Hill ("Bare Hill") Correctional Facility, which is located in the Northern District of New York, were severed from the Southern District action and transferred to the Northern District of

New York. (Dkt. No. 13).

On January 14, 2020, Senior Judge Kahn conducted an initial review of the portions of the complaint that were transferred to this district. (Dkt. No. 15). The following claims survived sua sponte review:[1]

> (1)    First Amendment retaliation claims against defendants Harmon, Coleman, and Albert.
>
> (2)    Eighth Amendment medical indifference claims against defendants Harmon, Coleman, and Albert.
>
> (3)    First Amendment free exercise claim against defendant Ranney.

(Dkt. No. 15 at 28).

The complaint was served on the above-remaining defendants, and discovery was conducted relative to the remaining claims. Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 48). Despite being afforded two extensions of time to do so, plaintiff has failed to respond to the motion.[2] (Dkt. Nos. 52, 54). For the reasons set forth below, this court will recommend granting defendants' motion.

---

[1] Senior Judge Kahn dismissed multiple claims and multiple defendants in his order, familiarity with which is assumed. (Dkt. No. 15). I will not repeat all of the dismissed claims herein.

[2] It appears that plaintiff has been released from incarceration. During his deposition, plaintiff testified that he was released on February 1, 2018. (Pl.'s Dep. at 18) (Dkt. No. 48-4). He filed a notice of change of address on September 27, 2021, along with his second request for extension of time to respond to the summary judgment motion. (Dkt. No. 53). The court notes that the "Notice of Appearance" filed by the current defense counsel on November 1, 2021 contained a different address for plaintiff that he indicated on September 27, 2021. (Dkt. No. 55). Defense counsel re-served her Notice of Appearance on the address listed on the court's records.

## II.     Facts

### A.     July 30, 2016 Slip-and-Fall Incident

On or about July 30, 2016,[3] plaintiff slipped in the shower and injured "the second toe on [his] left foot." (Complaint ("Compl.") ¶ 25) (Dkt. No. 2).  Following the injury, Plaintiff was transported by van to "the clinic." (*Id.*)  At the clinic, plaintiff was examined by Nurse M. Harmon, who instructed plaintiff to move his toe even after plaintiff informed her that he was unable to "wiggle [his] toe" and was "in pain." (Compl. ¶ 26).  Nurse Harmon asked plaintiff to flex his ankle, which he did, but then had a disagreement with Nurse Harmon about his ability to wiggle the affected toe. When plaintiff asked defendant Harmon her name because she was not wearing a name tag, plaintiff claims that defendant Harmon accused plaintiff of harassing her. (*Id.*) Defendant Albert, who had been sitting outside of the room asked plaintiff to come outside and sit for a while. (*Id.*)  Defendant Harmon came back out to get plaintiff and asked him if they could complete the evaluation "without [plaintiff] talking over her." (*Id.*)  Plaintiff states that all he wanted was a doctor to look at his foot, but that defendant Harmon refused to "write down the exact condition" of his foot. (*Id.*)

Plaintiff claims that he returned to the examination room. (Compl. ¶ 27). Plaintiff states that defendant Harmon asked plaintiff several more questions, and asked him to sign the injury report that she completed. (*Id.*)  Plaintiff states that he refused to sign defendant Harmon's form because the document contained "misinformation" about

---

[3] The complaint states that plaintiff's slip-and-fall happened thirty days after his arrival at Bare Hill. (Compl. ¶ 25).  Plaintiff was transferred to Bare Hill on June 30, 2016, thus, Senior Judge Kahn estimated the date of plaintiff's injury as July 26, 2016. (Compl. ¶ 24, 25) (Dkt. No. 15 at 4).

the condition of his toe. (*Id.*)  After Plaintiff refused to sign the injury report, defendant Harmon walked away, placed a call from "the phone on the back wall[,]" left the room, and then returned with two corrections officials. *Id.* at 17. One of those corrections officials, allegedly defendant Coleman, "asked [plaintiff] what the problem was and kept . . . disrespectfully telling [plaintiff] [that he] was harassing the nurse." *Id.*

When plaintiff explained why he had refused to sign the report, defendant Coleman allegedly told plaintiff to write in what he believed the correct information was and then sign the document. (*Id.*)  However, once plaintiff did what defendant Coleman requested, he "immediately told Nurse Harmon and C.O. Albert to write a misbehavior report for harassment" and ordered plaintiff to be "cube confined," pending a disciplinary hearing. (*Id.*)  Plaintiff claims that he waited four days to see a doctor, and his toe was "dislocated." (Compl. ¶ 30).

Plaintiff claims that defendants Harmon, Albert, and Coleman showed deliberate indifference to plaintiff's serious medical needs by refusing to send him to an outside hospital on the day of the injury and making him wait four days to see a doctor about his toe. (Compl. ¶ 30).  Plaintiff claims that their "phone call" was a "meeting of the mind [sic]" to deprive him of adequate medical treatment and then intimidate him by filing a misbehavior report to "cover" their own misconduct. (*Id.*)

**B.     Religious Practices**

Plaintiff alleges that, on or before January 11, 2017, defendant Reverend Ranney caused an "erroneous packet" to be distributed, which directed that members of the Nation of Islam ("NOI") "pick up Sahor [sic] bags from the mess hall on February 25,

2017, and "for us to eat at 12:30 by picking up a cold meal from the mess hall to be taken back to the gym."[4] (Compl. ¶ 24). On January 11, 2017, plaintiff notified the "facilitator" that the timing for the meal, listed in the information distributed by defendant Ranney was incorrect. (*Id.*) However, this error was not corrected, and as a result, plaintiff was not allowed to take food back to his cell. (*Id.*) Plaintiff states that this was not how Saviours' Day was celebrated for 20 years, and defendant Ranney's actions denied plaintiff the ability to "complete the fast." (*Id.*)

Plaintiff also claims that defendant Ranney failed to "place the DVD in the locker for class," and reduced the class time by one hour, which substantially burdened the plaintiff's exercise of his religion. (*Id.*) Finally, plaintiff claims that defendant Ranney failed to submit the paperwork for a fundraiser to get money for books, DVDs, and "other supplies." (*Id.*) Plaintiff claims that defendant Ranney was operating under a "conflict of interest" because "there is deep-seated racial animosity" at Bare Hill. (*Id.*)

As stated above, the parties completed discovery prior to the defendants' summary judgment motion. In their motion, defendants have filed exhibits which include additional information developed during discovery. (Dkt. No. 48-1-48-19). I will discuss the relevant additional facts in my analysis of the remaining claims.

## III.    **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material

---

[4] Although it is unclear from the complaint, the issue in this case has nothing to do with the food that was picked up in the Suhoor bags from the mess hall on February 25, 2017, which contained the breakfast meal that the inmates were to consume prior to sunrise on February 26, 2017. (Pl.'s Dep. at 129-31). Plaintiff's reference to eating at 12:30 was a different meal, which was obtained from the mess hall on February 26, 2017 and is the subject of this action.

fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## IV.  <u>Exhaustion of Administrative Remedies</u>

### A.  **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an

6

inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)), abrogated on other grounds by *Ross v. Blake*, 578 U.S. 632 (2016).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Incarcerated[5] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id.* § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations

---

[5] This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

governing the Incarcerated[6] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (I), 701.5.

Prior to *Ross v. Blake, supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated

---

[6] The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid.  The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability.  *Ross*, 578 U.S. at 642.  Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id; see also Riles*, 2016 WL 4572321 at *2.

### B.   Analysis

#### 1.   Medical Care/Retaliation (July 30, 2016 - Defendants Harmon, Albert, and Coleman)

Defendants concede that plaintiff has exhausted his medical care claims against defendant Nurse Harmon.  However, they argue that plaintiff has failed to exhaust any medical care claims as against defendants Albert and Coleman and has failed to exhaust retaliation claims against any of the three defendants involved in the plaintiff's medical care incident.

Plaintiff filed a grievance complaining about the medical care incident and appealed the denial of his grievance all the way to the CORC.  Defendants have included all of plaintiff's medical care grievance documents as Exhibit D to their summary judgment motion. (Dkt. No. 48-9, Def.s' Ex. D).  These documents include plaintiff's original grievance, dated July 30, 2016 (Def.s' Ex. D at 4-5), the IGRC response, dated August 8, 2016 (Def.s' Ex. D at 3), the Superintendent's response dated August 16, 2016 (Def.s' Ex. D at 2), and the CORC denial, dated February 15, 2017 (Def.'s Ex. D at 1).

9

Defendants argue that although plaintiff exhausted his medical care claims as against defendant Harmon, there is no mention of retaliation of any kind, and there is no indication that the medical care claims extended to defendants Albert and Coleman. One of the benefits of requiring administrative exhaustion is that it allows the officials to address complaints before being subjected to suit, "reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. at 219 (citations omitted); *Porter v. Nussle,* 534 U.S. at 524-25.

To fulfill the exhaustion requirement, "inmates must provide enough information [in a prison grievance] about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Popontoniou v. Quiros*, No. No. 3:19-CV-1996 (KAD), 2021 WL 4224587, at *9 (D. Conn. Sept. 16, 2021) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) and citing *Edwards v. Melendez*, 832 F. App'x 50, 53-54 (2d Cir. 2020) (summary order) ("Although a plaintiff need not specifically articulate his claims in grievances in the exact same manner that he articulates them in federal court, he is required to give notice to the defendants about the factual basis of his claims.") (citations omitted)). *See also Fox v. Sheltic*, No. 9:19-CV-498 (BKS/ATB), 2020 WL 7753543, at *4-5 (N.D.N.Y. Nov. 24, 2020), *report-recommendation adopted*, 2020 WL 7714607 (N.D.N.Y. Dec. 29, 2020) (no exhaustion where retaliation was not mentioned or implied in the grievance). The inmate filing the grievance "'need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some

asserted shortcoming.'" *Id.* (quoting *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (internal quotation marks and citation omitted)). "'[E]xhaustion is not per se inadequate simply because an individual later sued was not named in the grievances.'" *Id.* (quoting *Jones*, 549 U.S. at 219).

Plaintiff's grievance mentioned his injury, his ride to the clinic and his encounter with "Molly,"[7] who is defendant Harmon. (Harmon Decl.) (Dkt. No. 48-13). Plaintiff's grievance tracks his statement in his federal complaint that he disagreed with defendant Harmon about the condition of his toe, but states in the grievance that defendant Harmon made plaintiff sit outside. (Def.s' Ex. D at 4). When defendant Harmon let plaintiff back in the examination room, and he again refused to sign the injury report, plaintiff alleges that defendant went to the phone and "told someone." She then left the room and came back with two sergeants, one of whom was "Bergerman," who asked plaintiff what was wrong and told plaintiff to write his own version of the story. (*Id.*)

In his grievance, plaintiff further states that, after he wrote his "statement" asking to see a doctor because his toe was dislocated, "the same sergeant" told the van driver that plaintiff was on "cube confinement" and told defendant Harmon to "write [plaintiff] up for harassment and for refusing a direct order." (Def.s' Ex. D at 5). The "action requested" at the end of plaintiff's grievance was proper treatment for his medical conditions, including his toe and his heart condition.[8] Plaintiff stated that "I

---

[7] In his grievance, plaintiff only identified the nurse as "Molly." (Def.s' Ex. D at 4-5).

[8] Plaintiff's heart condition was a completely separate issue and was not the subject of, or even discussed, during the July 30, 2016 encounter with defendant Harmon. Plaintiff included the request for cardiac care as an additional claim in his grievance.

need [sic] want to be treated or seen by this nurse based upon this conflict of interest and denial of adequate care, hereinafter."[9] (*Id.*)  Plaintiff ended the grievance by stating that "[a]ny further acts of reprisal for filing this grievance should be prohibit [sic] by all staff member [sic]." (*Id.*)

The IGRC response denying plaintiff's grievance discussed only the medical care plaintiff received, plaintiff's disagreement with defendant Harmon's care, and plaintiff's refusal to sign the "examination report" that the defendant provided.[10] (Def.s' Ex. D at 3).  The IGRC response indicates that a misbehavior report was issued by the "infirmary officer."  Plaintiff's x-rays were taken on August 3, 2017, "the first day a tech [was] at the facility since the injury." (*Id.*)  The x-ray showed a dislocation, and a closed reduction[11] was performed by the facility doctor. (*Id.*)

The Superintendent's denial of plaintiff's grievance appeal considered both plaintiff's toe injury and the complaint about his cardiac care.  The Superintendent also noted that post-reduction x-rays showed good alignment. (Def.s' Ex. D at 2).  With respect to plaintiff's cardiac condition, the Superintendent, stated that plaintiff was transferred to Bare Hill, pending a cardiology consult. (*Id.*)  Plaintiff's request to be transferred back to his former facility for the consultation was denied by "Albany," and

---

[9] The court has interpreted this confusing statement as plaintiff asking ***not*** to be treated by defendant Harmon in the future, based upon this disagreement and alleged denial of adequate care, which he referred to as a "conflict of interest."

[10] The IGRC response did not discuss the plaintiff's cardiac condition.

[11] "Closed reduction is a procedure to set (reduce) a broken bone without surgery. It allows the bone to grow back together. It can be done by an orthopedic surgeon (bone doctor) or a primary care provider who has experience doing this procedure." https://medlineplus.gov/ency/patientinstructions/000522.htm.

a consultation had been scheduled at Bare Hill. (*Id.*)  Plaintiff's appeal of the

Superintendent's decision read as follows:

> The grievant was denied emergency sick call on 7/30/16,
> because the nurse did not to [sic] send the grievant to outside
> hospital for treatment and was very nasty.  7/30/16 was a
> Saturday x-ray could only be taken at outside hospital.

(*Id.*)

The CORC determination, dated February 15, 2017, was even more detailed.

(Def.s' Ex. D at 1). The CORC decision noted that plaintiff was argumentative and

uncooperative with the nurse during the July 30, 2016[12] incident.  The CORC stated

that the misbehavior report was issued based on plaintiff's argumentative and

uncooperative behavior.  The CORC decision informed plaintiff that there was a proper

procedure for challenging the accuracy of medical records. (*Id.*)  The CORC also found

that plaintiff was subsequently diagnosed and treated for his dislocated toe.  The closed

reduction for the toe was completed on August 3, 2017, the same day as the diagnosis.

Plaintiff was seen on August 24, 2017 and approved for a follow-up appointment.

Plaintiff was also examined by a cardiologist. (*Id.*)

The CORC stated further that the Department of Corrections and Community

Supervision ("DOCCS") Directive No. 4040 provides that "no reprisals of any kind

shall be taken an inmate or employee for good faith utilization of this grievance

procedure, and an inmate may pursue a complaint that a reprisal occurred through the

---

[12] The CORC even noted that the Superintendent's decision contained a typographical error
regarding the date of the incident and corrected it. (Def.s' Ex. D at 1).

grievance mechanism."[13] (Def.s' Ex. D at 1).  This reference to "reprisals" may have been in response to plaintiff's request that no one retaliate against him "in the future" for filing the grievance.  There is absolutely no reference to any kind of prior protected conduct, and no indication in any of the documents that plaintiff was complaining about anything other than defendant Harmon's medical care.  Plaintiff's comment that he was written up for harassment[14] and violating a direct order as a result of the dispute with defendant Harmon is not sufficient to alert the grievance officials to a retaliation claim by any of the three defendants.

Plaintiff's deposition supports this court's determination.  During his deposition, plaintiff was asked to explain the basis for the retaliation claim with respect to the July 30, 2016 incident.  Plaintiff's response contained a complicated, convoluted set of facts, indicating that the July 30, 2016 incident was only the tip of a continuous pattern of retaliation that began when he challenged discrimination in medical care at Otisville Correctional Facility, and that the defendants in this case must have looked at plaintiff's records to determine that he was a litigious inmate and somehow, they got together and retaliated against him for his complaints at Otisville. (Pl.'s Dep. at 68-73).  Clearly,

---

[13] The statement by the CORC reinforces the finding that no proper claim of "reprisal" was raised in the plaintiff's grievance because the plaintiff's statement about reprisals was so vague and was directed at "future" reprisals for filing the July 30, 2016 grievance, not any alleged retaliation that resulted in the current defendants' conduct.

[14] During his deposition, plaintiff conceded that he was never actually charged with harassment. (Pl.'s Dep. at 56).  That charged was crossed off of the misbehavior report before it was served on plaintiff. (Def.s' Ex. B) (Dkt. No. 48-15).  Plaintiff was charged only with interference and failing to follow a direct order. (*Id.*)  The misbehavior report indicates that the "direct order" was issued by defendant Albert, for plaintiff to "calm down" as he was demanding that defendant Harmon provide him with a doctor and immediate x-rays. (*Id.*)

none of these facts were specifically mentioned, or even remotely implied, in the grievance.[15]  Defendants have also submitted the declaration of Rachael Seguin, the Assistant Director of the Incarcerated Grievance Program, who asserts that her review of the records of the CORC show that plaintiff appealed no other grievance which asserts retaliation by defendants Harmon, Coleman, and Albert in connection with the July 30th incident. (Seguin Decl. ¶ 21 & Ex. A). Thus, plaintiff has failed to exhaust any retaliation claims against defendants Harmon, Coleman,[16] and Albert.  He has also failed to exhaust any medical care claims against defendants Coleman and Albert.[17] Thus, plaintiff's retaliation claims may be dismissed for failure to exhaust as against all three defendants, and plaintiff's medical care claims may be dismissed for failure to exhaust as to defendants Coleman and Albert.[18]

---

[15] To the extent that plaintiff's retaliation claim may be interpreted as alleging that the defendants "retaliated" against him by filing a misbehavior report because he asked for medical help, this is not alleged or implied in plaintiff's grievance either.

[16] The court also notes that defendant Coleman has submitted a declaration, stating that he had no interaction with plaintiff or defendants Harmon and Albert on July 30, 2016. (Coleman Decl. ¶ 3). Defendant Coleman was assigned to another area of Bare Hill and was not in the clinic at the time of the incident. (Coleman Decl. ¶ 5).  Plaintiff's grievance mentions Sergeant "Bergerman" as the individual who came into the examination room with defendant Albert and told plaintiff to write down what he believed to be the correct information on the injury report.  Plaintiff never mentioned defendant Coleman.  In order to be liable under section 1983, the defendant must have personal responsibility for the alleged constitutional violation. *Tangreti v. Bachmann*, No. 19-3712, __ F.3d __, 2020 WL 7687688, at *4-6 (2d Cir. Dec. 28, 2020).  Thus, in addition to failing to exhaust administrative remedies with respect to his retaliation claim, plaintiff has also failed to establish that defendant Coleman was personally involved in the medical care incident.

[17] The court notes that, in the alternative, and as discussed below, the plaintiff's medical care claims fail on the merits as to defendants Coleman and Albert as well as defendant Harmon.

[18] Generally, unexhausted claims may be dismissed without prejudice, but plaintiff has now been released from incarceration, and it will be impossible to exhaust his administrative remedies. Thus, these additional claims against defendant Ranney may be dismissed with prejudice. *Torres-Acevedo v. Blair*, No. 9:21-CV-52 (GLS/ATB), 2021 WL 4993540, at *6 (N.D.N.Y. Oct. 15, 2021)

### 2.    Religion Claims (Defendant Ranney)

Plaintiff makes two claims against defendant Ranney.  The first involves the defendant's error in scheduling the Saviours' Day meal on February 26, 2017, which according to plaintiff, was to be eaten after sundown.  Defendant Ranney apparently scheduled inmates to pick up their meals on February 26, 2017 and bring them to the gym for consumption prior to sundown,[19] thus, forcing plaintiff (and presumably other inmates celebrating the holiday) to break their fast prior to the appropriate time.  The second claim is much more vague and is apparently unrelated to the Saviours' Day celebration.  The second claim is that, at some unspecified point in time, defendant Ranney failed to provide a DVD for religious worship, reduced the time for NOI congregate study by one hour, and failed to process paperwork for a fundraiser. Plaintiff was required to exhaust each of these claims.

Plaintiff filed grievance BRL-14562-17 on February 28, 2017, complaining only about the scheduling issue. (Seguin Decl. Ex. B at 4).  Plaintiff requested that "packets for Ramadan be done and made specially by Minister Ronald Muhammad and no other non-member of the Nation of Islam to avoid a conflict of interest in religious practice and tenets, hereinafter." (*Id.*)  Defendant Ranney was not mentioned by name in plaintiff's grievance.  However, based on the Superintendent's subsequent decision, it is apparent that "Chaplain R." was responsible for the schedule. (Seguin Decl. Ex. B at

---

(citing *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004)), *report-recommendation adopted*, 2021 WL 5298674, N.D.N.Y., Nov. 15, 2021).

[19] Plaintiff alleges that the food was not to be taken out of the gym, so that he could not bring the food back to his cell in order to eat his meal at the appropriate time. (Def.s' Ex. B at 4) (plaintiff's grievance).

2). Plaintiff did not raise any other issues in this grievance and did not allege that defendant Ranney or any other individual failed to provide DVDs, shortened the NOI inmates' time for study, or failed to process paperwork for a fundraiser at any time. (Seguin Decl. Ex. B at 4).

The IGRC issued its decision on March 13, 2017, recognizing that the meal was served at the wrong time, but "according to the Religious Holy Day Calendar, this fast was optional." (Seguin Decl. Ex. B at 3). Notwithstanding, the IGRC stated that "in the future, religious packets will be reviewed referencing the Holy Day Calendar for accuracy." (*Id.*) Plaintiff appealed to the Superintendent, who responded on March 27, 2017, acknowledging the error made by Chaplain R., but "it was not done in malice." (Seguin Decl. Ex. B at 2). The Superintendent added that Chaplin R. had posted the schedule on January 17, 2017[20] for the February 25-26th holiday, and "no inmate brought the error to the Chaplain's attention."[21] (*Id.*)

On March 30, 2017, plaintiff signed his appeal "statement" to the CORC, stating only that religious packets should be "made" by an NOI minister. (Seguin Decl. Ex. B at 2). The Grievance Clerk acknowledged receipt of plaintiff's appeal on March 31, 2017. (*Id.*) Plaintiff raised no other religious claims against defendant Ranney or any

---

[20] In his complaint, plaintiff alleges that the information was posted on January 11, 2017, and that he informed the "the facilitator that there was an error." (Compl. ¶ 24, CM/ECF p. 14). In his grievance, plaintiff acknowledged that the schedule was posted on January 17, 2017. Defendants have included the Saviours' Day posting, dated January 17, 2017. (Ranney Decl. ¶ 14 & Ex. B) (Dkt. No. 48-19).

[21] In his grievance plaintiff did not claim that he brought the error to anyone's attention. In any event, the court notes that according to the posting the "facilitator" was another inmate. Thus, even if plaintiff discussed the problem with another inmate, there is no indication that defendant Ranney would have been made aware of the error.

other official.

Defendants argue that plaintiff failed to exhaust his administrative remedies with respect to the Saviours' Day meal scheduling issue because he signed his federal court complaint on April 12, 2017, before the CORC issued its decision, and even before the 30 days for the CORC to issue its decision had expired. Defendants argue that the prison mailbox rule provides that the date that an inmate signs his complaint is the date of filing, and thus, the plaintiff filed his action prior to exhausting his remedies, even if the CORC did eventually decide the appeal of his grievance.

First, the prison mailbox rule as articulated by the Supreme Court actually provides that a pleading is deemed filed **_when it is delivered to prison authorities for forwarding to the court_**. *Houston v. Lack*, 487 U.S. 266, 270 (1988). Because that day is often unclear or unable to be determined, courts have given plaintiffs the benefit of the doubt and have assumed that the day that the inmate signed the complaint is the day that he forwarded it to the prison officials for mailing. The rule was created to benefit inmates who have no control over when the prison officials actually mail documents so as to prevent those inmates from missing deadlines, including statutes of limitation, through no fault of their own. *See Pires v. Walker*, No. 3:18-CV-1726 (SVN), 2022 WL 168784, at *2 (D. Conn. Jan. 18, 2022).

In this case, the defendants are attempting to use the prison mailbox rule against plaintiff by stating that he "filed" his complaint prior to the deadline for the CORC to make its decision on his grievance. However, under the circumstances, this court does not accept defendants' argument. The Grievance Clerk signed the receipt for plaintiff's

18

CORC appeal on March 31, 2017, and the CORC received plaintiff's appeal on April 7, 2017. (Seguin Decl. Ex. B at 1; Ex. C (Dkt. No. 48-8)).  Thus, the CORC would have had until May 7, 2017 to render its decision.

Although plaintiff "signed" his complaint on April 12, 2017, the envelope filed with plaintiff's complaint shows that the postmark is May 8, 2017, and the envelope is stamped "received" by the Clerk in the Southern District of New York on May 10, 2017. (Dkt. No. 2 at 29).  Thus, although plaintiff signed his complaint prior to the expiration of CORC's deadline, the complaint was not mailed to the court until the day after the CORC's deadline expired.  Thus, the court will not use the prison mailbox rule to plaintiff's detriment and finds that plaintiff filed this action after the CORC deadline expired.  *See McLean v. LaClair*, No. 9:19-CV-1227 (LEK/ATB), 2021 WL 671650, at *8 n.8 (N.D.N.Y. Feb. 22, 2021) (rejecting defendants' argument that plaintiff's complaint should be dismissed on exhaustion grounds because it was dated October 1, 2019–less than thirty days after plaintiff submitted, on September 3rd, his as yet unresolved CORC appeal–in part because the complaint was not filed until October 4th –more than thirty days after date of the submission to CORC).

In his complaint, plaintiff recognized that he did not have a final CORC decision on some of his grievances,[22] but stated that he heard from the IGP Supervisor that it was taking the CORC six months to issue its decisions.  Thus, plaintiff alleged that defendants "waived" any failure to exhaust argument. (Compl. ¶ 48). While defendants

---

[22] Plaintiff does not specify to which grievances he is referring, but since he did not have the final CORC decision for his Saviours' Day claim, the court will assume that he is at least referring to Grievance BRL-14562-17.

are correct that plaintiff's speculation that the CORC would take longer than thirty days would not be sufficient in itself, the fact that plaintiff may have written his complaint prior to the thirty day deadline and then waited to mail it until after the thirty days expired is sufficient to show that the remedy was unavailable.[23] *See Hayes v. Dahlke*, 976 F.3d 259, 270-71 (2d Cir. 2020) (once the CORC's time limit has expired, the inmate need not have to speculate how long he will have to wait before receiving a response). Therefore, I find that the defendants' exhaustion argument may not succeed on plaintiff's Saviours' Day meal claim against defendant Ranney.

The same is not true for any other claims against defendant Ranney. Plaintiff never filed any grievance complaining about DVDs, class time, or failure to complete paperwork for a fundraiser.[24] A review of the list of CORC appeals filed by plaintiff shows that there are no other grievances that make claims against defendant Ranney for the additional conduct that plaintiff claims violated his First Amendment rights. (Seguin Decl. Ex. A). Thus, plaintiff has failed to exhaust his administrative remedies with respect to his second claim against defendant Ranney, and such claim may be

---

[23] Although, not the basis for my decision, I note that plaintiff underestimated the time it would take for the CORC to respond. The CORC's decision on BRL-14562-17 was dated May 9, 2018, more than one year after plaintiff signed his appeal, and was dismissed as moot because plaintiff was released from incarceration in February of 2018. (Seguin Decl. Ex. B at 1). This is an example of why the Second Circuit may have decided *Hayes, supra* the way that it did.

[24] There were no specific dates listed in the complaint for the alleged conduct. During his deposition, plaintiff could not remember to which fundraiser he was referring. (T. 151). Plaintiff also testified that someone told him that defendant Ranney reduced the study time for NOI inmates. (T. 145). It was clear that plaintiff did not have any specific dates or incidents in mind with respect to these additional claims against defendant Ranney. This demonstrates the benefits of the exhaustion requirement. If plaintiff had submitted a contemporaneous grievance related to these additional claims, he would have made a record of the particulars of defendant Ranney's alleged unconstitutional conduct and would have given DOCCS adequate notice.

dismissed with prejudice, while the court will consider plaintiff's Saviours' Day claim on the merits.

## V.    **Medical Care (Defendant Harmon)**

### A.    **Legal Standards**

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

#### 1.    **Objective Element**

There is a two part inquiry to determine whether an alleged deprivation is "objectively serious." *Benjamin v. Pillai,* 794 F. App'x 8, 11 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Salahuddin*, 467 F.3d at 279-80 (citing *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)).

The second part of the objective test asks whether the purported inadequacy in

the medical care is "sufficiently serious." *Benjamin v. Pillai*, 794 F. App'x at 11 (citing *Salahuddin*, 467 F.3d at 280). The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Salahuddin*, 467 F.3d at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185-86). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Benjamin v. Pillai*, 794 F. App'x at 11. The court in *Benjamin* reiterated that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Benjamin*, 794 F. App'x at 11 (citing *Smith*, 316 F.3d at 185).

### 2. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Benjamin*, at 11 (citing *Hathaway v. Coughlin*, 511 U.S. 825, 553 (2d Cir. 1996)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff

must show that the defendant was "deliberately indifferent" to that serious medical condition, *i.e.*, that the charged official possessed "'a state of mind that is the equivalent of criminal recklessness.'" *Benjamin* at 11, (quoting Hathaway, 99 F.3d at 553).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Abreu v. Lipka,* 778 F. App'x 28, 32 (2d Cir. 2019) (quoting *Smith,* 316 F.3d at 184). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer,* 730 F. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice.

23

*Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation.  *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.  *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate.  *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983).  Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

### B.    Analysis

Plaintiff claims that defendant Harmon was deliberately indifferent to his serious medical needs when she refused to send him to an outside hospital for x-rays and other medical care on July 30, 2016, after he fell in the shower.  Defendant Harmon has submitted a declaration in support of the defendants' motion. (Harmon Decl.) (Dkt. No. 48-13).  Defendant Harmon's declaration describes her care of plaintiff on July 30, 2016.  Defendant Harmon states that, when plaintiff arrived at the infirmary, he was walking on his own, without assistance, although she did notice that he was walking with a slight limp. (Harmon Decl. ¶¶ 6-7).  Defendant Harmon described how she generally examines a patient with an injury to his foot or toe, and specifically how she performed plaintiff's examination. (Harmon Decl. ¶¶ 8-22).

24

Defendant stated that she examined plaintiff's foot, felt for his pedal pulse, which was strong, and performed a capillary return test, which indicated to defendant Harmon that plaintiff's circulation was not impaired. (Harmon Decl. ¶¶ 14, 15).  Defendant stated that plaintiff was able to flex and extend his ankle, and she observed that he was able to move his toes, including the injured toe.[25] (Harmon Decl. ¶ 17).  Although plaintiff claimed that his second toe felt different, defendant Harmon stated that she did not observe a significant deformity to the second toe, and in the absence of such deformity, it was difficult to determine whether any bends or defects in the toe were caused by the current injury or whether they were pre-existing. (Harmon Decl. ¶ 18). Plaintiff's toes showed no redness or swelling, and plaintiff did not verbalize any discomfort upon palpation. (Harmon Decl. ¶¶ 19-20).  At the end of defendant Harmon's examination, she determined that plaintiff should be further examined by a medical doctor. (Harmon Decl. ¶ 21).

July 30, 2016 was a Saturday, and generally, there were no medical doctors or x-ray technicians were available at the facility. (Harmon Decl. ¶ 23). In the event that an emergency situation arose, the nursing staff was required to initiate an emergency department telemed evaluation or contact "Emergency Medical Services" outside the facility for transportation to an outside hospital. (Harmon Decl. ¶ 25).  Defendant Harmon stated that referral to an outside hospital for a "non-emergency" situation may only be authorized by a physician, either after an in-person examination or a telemed evaluation. (Harmon Decl. ¶ 26).

---

[25] In his complaint, plaintiff disputed that he could wiggle his injured toe. (Compl. ¶ 26).

Defendant Harmon stated that, during her examination of plaintiff, he insisted to be immediately taken to an outside hospital, but defendant Harmon did not believe that plaintiff was experiencing a medical emergency or had any condition that posed immediate danger to his health. She did not believe that plaintiff's condition warranted a trip to an outside hospital. (Harmon Decl ¶ 28). There was nothing life-threatening about a toe injury, no objective evidence of injury to the toe, and any visible defect thereof could have been attributable to a former injury. (Harmon Decl. ¶¶ 29-30). The limited objective signs that defendant Harmon did note, redness and slight swelling in the foot, did not seem consistent with an injury to his second toe. (Harmon Decl. ¶ 31).

Defendant Harmon completed an injury report, detailing the above findings, but when she told plaintiff that she would be referring him to a doctor so that he could evaluate whether an x-ray was necessary, plaintiff became angry and began talking loudly over defendant Harmon. (Harmon Decl. ¶ 33). He continued to insist on being taken to an outside hospital and refused to sign the injury report. (Harmon Decl. ¶¶ 33-35). When plaintiff became loud, defendant Albert (who was stationed at the desk outside the room) came in to assist defendant Harmon. (Harmon Decl. ¶ 36). Defendant Harmon stated that, despite defendant Albert's initial "efforts," plaintiff continued to talk over both defendants and an area sergeant was called to assist. (Harmon Decl. ¶¶ 37-38). Plaintiff eventually signed the report, writing his own statement below that of defendant Harmon. (Harmon Decl. ¶ 36 & Ex. A).

Defendant Harmon stated that, by the time that defendant Albert came into the room, defendant Harmon had already completed the examination and was finishing up

the paperwork. (Harmon Decl. ¶ 39).  Defendant Harmon gave the plaintiff ibuprofen and scheduled him for re-evaluation by a nurse and by a medical doctor to determine if x-rays were appropriate. (Harmon Decl. ¶ 40 & Ex. A).  Defendant Harmon stated that, after her examination was complete, she placed an "x-ray slip" on the doctor's desk. (Harmon Decl. ¶ 41).  Following the incident, defendant Albert wrote a misbehavior report which defendant Harmon signed as a witness. (Harmon Decl. ¶ 44 & Ex. B). According to facility records, Dr. Connelly approved plaintiff's x-ray on August 2, 2016, plaintiff had the x-ray on August 3, 2016, and he had his dislocated toe realigned on the same day. (Harmon Decl. ¶¶ 45-46 & Ex. C).

Defendant Harmon also stated that neither defendant Albert, nor defendant Coleman had any involvement in plaintiff's medical care.  By the time that defendant Albert entered the examination room, defendant Harmon had already completed her examination of the plaintiff's foot and was completing the injury report. (Harmon Decl. ¶ 49).  All of the information that she used for her assessment was based solely on her discussion with plaintiff and upon her own observation of the plaintiff's condition. (*Id.*) Defendant Harmon's discussion concerning the plaintiff's medical condition was conducted outside the presence of any corrections officer. (*Id.*)

Defendant Harmon disputes any allegation by plaintiff that she did not touch or examine his foot, nor did she tell him there was "nothing wrong" with his foot. (Harmon Decl. ¶ 48).  She states that she would not have submitted an x-ray request, nor would she have scheduled plaintiff for follow-up appointments by the medical doctor if she believed that there was "nothing wrong" with his foot. (Harmon Decl.

¶ 48). She observed and noted on the injury report that there was visible redness and slight swelling in the foot. (*Id.*) Instead, the records show that she believed plaintiff's medical condition warranted review by a physician, notwithstanding the lack of an emergency that would justify a trip to an outside hospital.

Based on the evidence presented, plaintiff raises no question of material fact relative to his medical care on July 30, 2016.[26] Defendant argues both, that plaintiff has failed to show an objectively serious condition and that plaintiff has failed to raise an issue of fact with respect to the subjective element as well. This court agrees. Plaintiff's toe was dislocated, and defendant Harmon noted that plaintiff walked into the infirmary without assistance. Her examination showed good pedal pulse as well as proper capillary refill. Her assessment was that, based on some swelling and plaintiff's complaints of pain, he should be given ibuprofen and scheduled to see a doctor. Plaintiff was examined when the doctor was back in the facility, a x-ray was taken only four days after the incident,[27] and the doctor performed a closed reduction the same day.

Plaintiff challenges the type of care that he received. He does not allege that he was denied medical care. As defendants note, broken toes and broken fingers, in themselves, have not generally been held to rise to the level of constitutionally

---

[26] Plaintiff has not responded to the summary judgment motion, and thus, has failed to challenge any of defendant Harmon's statements of fact. "Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding pro se." *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 209 (N.D.N.Y. 2008); *Evans v. Albany Cty. Corr. Facility*, No. 9:05-CV-1400 (GTS/DEP), 2009 WL 1401645, at *6 & n.35 (N.D.N.Y. May 14, 2009) (collecting cases).

[27] July 30, 2016 was a Saturday, and thus, plaintiff was approved for his x-ray on Tuesday, the x-ray was taken and his toe realigned on Wednesday.

significant serious conditions. *See Witt v. Bell*, 551 F. App'x 240, 241 (5th Cir. 2014))
(x-ray of a fractured toe did not suggest an injury that posed an excessive risk to
inmate health).  Even if plaintiff's condition were sufficiently serious, at worst, plaintiff
disagreed with defendant Harmon's evaluation and course of treatment. Defendant
Harmon determined that plaintiff's condition was not serious enough to warrant a trip
to an outside hospital, and plaintiff's belief that she was wrong does not establish a
constitutional violation by defendant Harmon. As stated above, plaintiff was examined
by a physician, an x-ray was taken, and his toe was reset on August 3, only four days
after the injury and on the same day that an x-ray technician was available at the
facility.  There is no indication that defendant Harmon was deliberately indifferent to
plaintiff's serious medical condition.  Thus, the complaint may be dismissed in its
entirety on the merits as against defendant Harmon.[28]

## VII.  First Amendment (Religion) (Defendant Ranney)

### A.    Legal Standards

Inmates have the right under the First and Fourteenth Amendments to freely
exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing
*Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  However this right is not limitless, and
may be subject to restrictions relating to legitimate penological concerns. *Benjamin v.
Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).  The analysis of a free exercise claim is
governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342

---

[28] Given that defendants Coleman and Albert played no role in determining plaintiff's
medical care and that Nurse Harmon's care was not found to be constitutionally deficient,
plaintiff's medical care claims against the two defendant correction officers would also be
subject to dismissal.

(1987) and *Turner v. Safely*, 482 U.S. 78, 84 (1987).  This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89).  An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted).  In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-23 (2d Cir. 2014).  In *Holland*, the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-21. The Second Circuit has not decided whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* at 220 (citing *Salahuddin, supra* at 274-75; *Ford, supra* at 592 (where the court assumed without deciding that the substantial burden test applies)).  While the court in *Holland* did not decide the issue, it

assumed the continued validity of the substantial burden test and analyzed the case accordingly.[29] *Id.* at 221.  This court will follow the analysis in *Holland* and will consider the First Amendment claim, assuming that the substantial burden test is still valid.

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y.  March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274).  Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiff to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.  "Given the difficult judgments attendant to prison operation," a generally applicable policy, even if that policy burdens an inmate's freedom to exercise his religion, will not rise to the level of a constitutional violation if that policy is "reasonably related to legitimate penological interests." *Holland*, 758 F.3d at 222.

### B.    Analysis

In this case, plaintiff claims that defendant Ranney did not schedule the NOI

---

[29] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland*, 758 F.3d at 221.

inmates' 2017 Saviours' Day meal at the proper time. Plaintiff claims that the meal was scheduled at noon in the gym. The inmates were required to pick up their meals and eat in the gym at 12:30 p.m. Apparently, no food was to be taken out of the gym, so plaintiff could not bring the food back to his cell, and any food that was not consumed was to be thrown away. Plaintiff claims that the fast was not to be broken until sundown, placing plaintiff in the position of breaking his fast ahead of schedule or not eating the meal because the food could not be taken out of the gym for later consumption. Plaintiff claims that a "non-NOI" chaplain should not have been tasked with making the Saviours' Day schedule. Plaintiff is not challenging a "policy," but an apparent error by defendant Ranney in coordinating the 2017 Saviours' Day event.

Defendant Ranney states that, at the time of the incident herein, he was the Coordinating Chaplain for DOCCS, with an office at Bare Hill. (Ranney Decl. ¶ 3). As the Coordinating Chaplain, defendant Ranney served as the principal advisor to the Bare Hill Superintendent regarding religious programs at that facility, and he was charged with the coordination of such programs. (Ranney Decl. ¶ 4). Defendant Ranney also assisted with special events for groups of inmates. (*Id.*)

DOCCS has a Division of Ministerial, Family, and Volunteer Services ("MFVS"). (Ranney Decl. ¶ 5). MFVS is in charge of ensuring that religious programs and practices are carried out in accordance with the established beliefs and practices of the particular faith, the United States Constitution, and DOCCS policies and procedures. (Ranney Decl. ¶ 6). MFVS compiles an "Annual Religious Calendar," which consists of a list of the approved dates of religious observation, celebrations,

protocols, and accommodations for each identified religious group within DOCCS. (Ranney Decl. ¶ 7). The religious events are listed on an "events calendar" so that all groups are afforded the appropriate accommodations. (*Id.*) Deviations from these schedules may be made only with the approval of DOCCS Central Office. (*Id.*)

The Chaplain of each facility is in charge of coordinating special events. However, the Superintendent of the facility is ultimately responsible for designating the location of religious services, worship, and other programs, after consulting the Chaplains and the Coordinating Chaplain. (Ranney Decl. ¶ 9). Defendant Ranney states that the 2017 Religious Calendar states that, for Saviours' Day, "'inmates are afforded the opportunity to have an in-house program during the day. Optional fast.'" (Ranney Decl. ¶ 12 & Ex. A).[30] Defendant Ranney notes that, unlike for other events, the Saviours' Day schedule did not have a designated time for meals, nor did it have any other limitation as to when those meals could be served. (Ranney Decl. ¶ 13). Further, the calendar states that the "in-house" program was to take place "during the day." (*Id.* & Ex. A).

Defendant Ranney states that it was his first time organizing this particular event at any DOCCS facility. (Ranney Decl. ¶ 23). On January 17, 2017, more than one month prior to the event, defendant Ranney posted an announcement regarding the February 26, 2017 event. (Ranney Decl. ¶ 14 & Ex. B). The posting provided for a daytime event, running from 10:00 a.m. until 2:30 p.m. and provided that inmates would be allowed to eat their meal together in the Gym Annex. (Ranney Decl. ¶ 15 &

---

[30] Exhibit A to the Ranney Declaration is a copy of the pertinent pages of the 2017 Religious Calendar.

Ex. B).  Defendant Ranney believed that his posting was consistent with the information in the Religious Calendar and provided that inmates who wished to fast had the option to do so. (Ranney Decl. ¶ 16).  Plaintiff, himself, was listed as one of the individuals who was scheduled to participate in the event and who was approved to assist with set-up and clean-up. (Ranney Decl. ¶ 17 & Ex. B at 2).  Plaintiff's name is listed on the January 17 posting. (*Id.*)  Thus, plaintiff was well-aware of the schedule more than one month prior to the event.  Plaintiff never brought any errors or concerns to defendant Ranney's attention in the month preceding the Saviours' Day event.[31] (Ranney Decl. ¶ 19).

Defendant Ranney states that, prior to posting, the notice was reviewed by a representative of Food Services, the Acting Deputy Superintendent of Programs, and Deputy Superintendent of Security, none of whom brought any errors to defendant Ranney's attention. (Ranney Decl. ¶ 20).  Copies of the notice were also sent to the Executive Team, facility Captains, Watch Commander, Activity Building Sergeant, Activity Building Officer, Recreation, Gym Lobby Office, and the school supervisors, but none of these individuals brought any errors to defendant Ranney's attention. (Ranney Decl. ¶¶ 20, 21).

On the day of the event, defendant Ranney was informed that, in previous years, Saviours' Day meals had been "held" following sunset to accommodate those individuals who fasted in connection with the holiday. (Ranney Decl. ¶ 22).  When

---

[31] Plaintiff does not argue otherwise.  As stated above, plaintiff stated that he complained about the timing of the meal to the "facilitator," who was another inmate; but there is no indication that the message was relayed to defendant Ranney.

plaintiff brought his grievance, both the IGRC and the Superintendent stated that the meal was "served at the wrong time," however the Superintendent stated that it was "not done in malice," and that no one alerted defendant Ranney to the error. (Seguin Decl. Ex. B at 2, 3).  Notwithstanding the statements by the IGRC and the Superintendent, if there was a "wrong time" for this meal, the correct time was not stated in the Religious Calendar.  Defendant Ranney states that he began working at Bare Hill in 2016, he never had scheduled this event at any facility, and he did not know that a different procedure involving an accommodation was followed in the past. (Ranney Decl. ¶¶ 3, 22, 23).

Plaintiff cannot establish a substantial burden on the practice of his religion.  He was aware of the time of the event and the time of the meal for at least one month prior to the event.  Plaintiff was well aware of how to complain about a problem and had no hesitation in doing so.  Plaintiff has appealed more than 300 grievances to the CORC. (Seguin Decl. Ex. A).  During his deposition, plaintiff exhibited a detailed knowledge of how the religious schedules were created, who was responsible for creating them, and how many individuals were required to "sign off" on the schedule. (Pl.'s Dep. at 133-36).  Plaintiff testified that before he came to Bare Hill, he was an "inmate liaison coordinator" for the "I.O.C.,"[32] whose job it was to present inmates' complaints to the

---

[32] Plaintiff does not indicate what the "I.O.C" stands for, although he may be referring to the "I.L.C." which stands for Inmate Liaison Committee.  Plaintiff's testimony regarding his duties on that committee would coincide with the duties of an inmate on the I.L.C.  The purpose of the I.L.C. are (1) [e]ffective communications between inmates and administration for accurate dissemination and exchange of information, and (2) "[a] means to facilitate consideration and analysis of suggestions from inmates relative to facility operations." *See Dolan v. Connolly*, 794 F.3d 290, 292, 294 (2d Cir. 2015) (discussing the inmate liaison committee and indicating that "the ILC is a group of inmates elected to communicate grievances to officials" (internal quotation marks omitted)). *See also* New

administration. (Pl.'s Dep. at 136-38). Plaintiff was well aware of how to raise issues with the administration.

In addition, plaintiff was scheduled to assist in set-up and clean-up during the event, so plaintiff was well aware of the timing of the meal. If plaintiff believed that the practice of his religion was being substantially burdened, or burdened at all, he had plenty of time to raise this issue with corrections personnel. The fact that he failed to do so indicates that the issue may not have been as important as he claims it to be. Although in some circumstances, missing an important religious meal has been held to rise to the level of a substantial burden, generally one instance of a plaintiff missing a religious meal or missing religious services does not rise to the level of a substantial burden. *See McLeod v. Williams*, No. 18-CV-115 (RA), 2020 WL 2512164, at *4-5 (S.D.N.Y. May 15, 2020); *Smith v. Graziano*, No. 9:08-CV-469 (GLS/RFT), 2010 WL 1330019, at *9 (N.D.N.Y. Mar. 16, 2010) (cancellation of two religious services did not substantially burden plaintiff's religion). "Although demonstrating a substantial burden is "'not a particularly onerous task,' . . . , the requirement is not met 'by a de minimis imposition on the free exercise of religion.'" *Aikens v. Hunter*, No. 17-CV-1266S, 2021 WL 878501, at *6 (S.D.N.Y. Mar. 9, 2021) (citing *Leach v. New York City*, No. 12 CIV. 3809 (PAC/JCF), 2013 WL 3984996, at *5 (S.D.N.Y. Aug. 2, 2013) (quoting *McEachin v. McGinnis*, 357 F.3d at 197, 203 n. 6 (2d Cir. 2004)).

Plaintiff was not "forced" to break his fast. He could have chosen not to eat the meal, which he also claims was "cold." During his deposition, he testified that he could

---

York State DOCCS Directive No. 4002 (July 21, 2015), http://www.doccs.ny.gov/Directives/4002.pdf.

have eaten food that he had in his cell if he had chosen to fast until sunset. (Pl.'s Dep. at 131-33).  Later during the deposition, plaintiff testified that he was "forced" to break the fast because if he did not eat, he "wasn't going to get to eat." (Pl.'s Dep. at 172-73). However, it is clear from the deposition testimony, that plaintiff meant that he was not going to be able to eat "***that meal***" because it was a special meal, and the food that was not consumed in the gym was going to be thrown away.[33] (Pl.'s Dep. at 132, 173). Plaintiff also alleged that if inmates did not eat the meals they were given during the day, and the meals had to be thrown away, the officials would be wasting NOI funds.[34] (Pl.'s Dep. at 173). Thus, plaintiff was not forced to eat during the day or not at all.

At worst, defendant Ranney was simply unaware of the previous accommodation made for inmates who wished to fast until sunset.[35]  It has been held, at the district court level, that damage claims based solely on the negligent infringement of a prisoner's right to religious freedom are not actionable under the First Amendment. *See Hamilton v. Countant*, No. 13-CV-669 (RA), 2016 WL 881126, at *4 (S.D.N.Y. Mar. 1, 2016) (citing *Guillory v. Ellis*, No. 9:11-CV-600 (MAD), 2014 WL 4365274, at *9 (N.D.N.Y. Aug. 29, 2014)).  In my Report-Recommendation in *Guillory v. Ellis*, which was adopted over plaintiff's objections by District Judge D'Agostino, I found that "[t]his

---

[33] This is further support for the finding that plaintiff knew that he would not be required to eat his meal in the gym if he chose to fast until sunset.

[34] Wasting NOI money or wasting food in general, while potentially problematic, was not a substantial burden on plaintiff's exercising his religion.

[35] Plaintiff has not responded to the defendants' summary judgment motion, and he has thus failed to challenge defendant Ranney's sworn declaration that he was previously unaware of the facility's accommodation.

one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant . . . ." *Id.*  In this case, the Religious Calendar noted that the fast was "optional," but did not provide any direction regarding those inmates who fasted until sunset since the event was clearly to be scheduled during the day.[36] Defendant Ranney was unaware of past accommodations. Plaintiff has failed to establish that a substantial burden was placed on him due to defendant Ranney's conduct, and has also failed to establish that defendant Ranney acted with the requisite state of mind with respect to planning the 2017 Saviours' Day event.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 48) be GRANTED, and the complaint DISMISSED IN ITS ENTIRETY AS AGAINST ALL REMAINING DEFENDANTS.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: February 17, 2022

Andrew T. Baxter
U.S. Magistrate Judge

---

[36] To the extent that plaintiff alleges that his food was cold, defendant Ranney states that the meal was to be a hot meal delivered from the kitchen. (Ranney Decl. ¶¶ 27-28).  Defendant Ranney had no responsibility for how the food was served. (Ranney Decl. ¶¶ 27-28).